**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CASE NO. _____

**UNITED STATES OF AMERICA**

v.                                                                15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(4),
                                                                  78m(b)(5), 78ff(a); 18 U.S.C. § 2

**PANASONIC AVIONICS**
**CORPORATION,**

        **Defendant.**

_____/

**INFORMATION**

The United States charges that, at all times relevant to this Information, unless otherwise specified:

**The Foreign Corrupt Practices Act**

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person. The FCPA's accounting provisions, among other things, require that any issuer make and keep books, records, and accounts that accurately and fairly reflect the transactions and disposition of the company's assets, prohibit the knowing and willful falsification of an issuer's books, records, or accounts, and prohibit the knowing and willful failure to implement an adequate system of internal accounting controls. 15 U.S.C. §§ 78m(b)(2), 78m(b)(5), and 78ff(a).

**Relevant Entities and Individuals**

2.      Panasonic Corporation ("Panasonic") is a multinational electronics corporation headquartered in Japan, which employs over 250,000 employees worldwide. Until April 22, 2013, shares of Panasonic's stock traded on the New York Stock Exchange as American Depository Receipts, and Panasonic was required to file periodic reports with the Securities and Exchange Commission ("SEC") pursuant to Section 15(d) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78o(d). Panasonic was therefore an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b), until it deregistered on April 22, 2013, and again for a brief period between 2015 and 2016 as a result of a share swap transaction that retriggered Panasonic's obligation to file its financial statements with the SEC.

3.      Panasonic Avionics Corporation ("PAC") is a wholly-owned subsidiary of Panasonic that designs and distributes in-flight entertainment systems ("IFE") and global communications services ("GCS") for airlines and airplane manufacturers. PAC is headquartered in Lake Forest, California, and employs approximately 4,600 employees worldwide. PAC was therefore a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h). PAC's financial statements are fully consolidated into Panasonic's financial statements.

4.      "PAC Executive 1," an individual whose identity is known to the United States and PAC, was an officer and high-level executive of PAC from at least 2005 until he was separated from the Company in 2017. PAC Executive 1 was named as an Executive Officer of Panasonic on April 1, 2013. At the end of each fiscal year for the relevant period, PAC Executive 1 was responsible for signing certifications that PAC's internal controls over its financial reporting were functioning effectively for Sarbanes-Oxley consolidation purposes.

5. "PAC Executive 2," an individual whose identity is known to the United States and PAC, was an officer and high-level executive of PAC from approximately 2008 until June 2012. During the period that PAC Executive 2 served at PAC, he held a concurrent title at one of Panasonic's eight reporting segments. In April 2013, PAC Executive 2 assumed a senior leadership role within one of Panasonic's reporting segments. For fiscal years 2007 through 2011, PAC Executive 2 signed PAC's Sarbanes-Oxley certifications on behalf of the department he oversaw within PAC, attesting that its internal controls over its financial reporting were functioning effectively. PAC Executive 2 was separated from Panasonic in 2017.

6. "PAC Executive 3," an individual whose identity is known to the United States and PAC, was a senior finance executive at PAC from approximately 2009 until June 2012 when he left PAC to assume a finance position within Panasonic. For fiscal years 2009 through 2011, PAC Executive 3 signed PAC's Sarbanes-Oxley certifications on behalf of PAC's finance department, attesting that PAC's internal controls over its financial reporting were functioning effectively.

7. "PAC Executive 4," an individual whose identity is known to the United States and PAC, was a senior finance executive at PAC from approximately June 2012 until April 2016. For fiscal year 2012, PAC Executive 4 signed PAC's Sarbanes-Oxley certification on behalf of PAC's finance department, attesting that PAC's internal controls over its financial reporting were functioning effectively. PAC Executive 4 was separated from Panasonic in 2018.

8. "PAC Sales Agent 1," an individual whose identify is known to the United States and PAC, served as PAC's sole sales representative in PAC's Middle East region for the marketing and sale of IFEs from at least 1989 until his contract with PAC was terminated in 2016. PAC Sales Agent 1 was an "agent" of PAC within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(a).

9. "Service Provider," an entity whose identity is known to the United States and PAC, is a California corporation related to another corporation retained by PAC for technical publication services.

10. "Middle East Airline," an entity known to the United States and PAC, is a commercial airline based in the Middle East that is wholly-owned by a foreign government. Middle East Airline was an "instrumentality" of a foreign government, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

11. "Foreign Official," an individual whose identity is known to the United States and PAC, was employed as a senior contracts official at Middle East Airline until February 2008. While so employed, Foreign Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

12. "Domestic Airline," along with its successor corporate organization, both entities known to the United States and PAC, were publicly-owned commercial airlines based in the United States during the relevant period.

13. "Domestic Airline Consultant," an individual whose identity is known to the United States and PAC, was employed as an account manager at PAC from 2000 until April 2007. Beginning in May 2007, Domestic Airline Consultant served as a consultant for Domestic Airline until December 2013.

14. "PAC Sales Agent 2," an entity whose identity is known to the United States and PAC, was a sales agent based in Malaysia that PAC contracted directly with to obtain and manage contracts with multiple airlines, including state-owned airlines, throughout Asia until PAC terminated its contract in 2015.

15. "PAC Sales Agent 3," an entity whose identity is known to the United States and PAC, was a sales agent based in Thailand that PAC contracted directly with to obtain and manage contracts with a state-owned airline in Thailand until 2009.

16. "PAC Sales Agent 4," an entity whose identity is known to the United States and PAC, was a sales agent based in Singapore with which PAC sought to contract directly in 2010 to obtain and manage contracts with a state-owned airline in Vietnam.

### Overview of the Scheme

17. Between 2007 and 2013, PAC employees, including senior executives, engaged in a scheme to retain consultants for improper purposes other than for providing actual consulting services. The consultants were retained through Service Provider and were paid for out of a budget over which PAC Executive 1 had complete control and discretion without meaningful oversight by anyone at PAC or Panasonic. First, in July 2007, PAC executives began negotiating a consulting position with Foreign Official at the same time that Foreign Official was involved in negotiating a lucrative contract amendment on behalf of Middle East Airline with PAC. Although Foreign Official ultimately did little work for PAC, over a six-year period PAC made $875,000 in payments to Foreign Official that were accounted for in Panasonic's accounting books and records as legitimate consulting expenses. Second, in October 2007, PAC retained as a consultant Domestic Airline Consultant who was already working as a consultant for Domestic Airline, and then used Domestic Airline Consultant to obtain confidential non-public business information about the airline, including information about its negotiations with PAC competitors. Over a five-year period, PAC made $825,000 in payments to Domestic Airline Consultant that were accounted for in Panasonic's accounting books and records as legitimate consulting expenses. Despite knowing that PAC was falsely recording these payments as legitimate consulting expenses, PAC Executive 1 falsely certified in Sarbanes-Oxley certifications that "no deficiencies have been

5

identified and the internal control[s] over financial reporting have effectively functioned in [the] company."

18.  Between 2007 and 2016, certain PAC employees also concealed PAC's use of sales agents in Asia, some of which did not pass PAC's internal diligence requirements. PAC formally terminated its relationship with these sales agents, as required by PAC's compliance policies, but certain PAC employees then secretly continued to use the agents by having them rehired as sub-agents through PAC Sales Agent 2, which had passed PAC's due diligence checks. Through this process, PAC employees hid more than $7 million in payments to at least thirteen sub-agents, some of which had not passed due diligence checks, by improperly reporting them as legitimate commission payments to PAC Sales Agent 2 or other sales agents. Despite receiving warnings and red flags about this conduct, PAC Executive 2 and other PAC employees took no action to prevent the continued use of PAC Sales Agent 2 to funnel payments to other sales agents.

**PAC's Retention of Consultants Through the Office of the President Budget**

19.  To cover expenses incurred by at least one senior PAC executive, such as travel, corporate entertainment, and consultancy payments, PAC designated an Office of the President Budget. The Office of the President Budget was set annually by a PAC finance executive, in consultation with PAC Executive 1. The funds allocated to the Office of the President Budget were set on a yearly basis, based on the previous year's costs and adjusted if changes in expenses were expected. The Office of the President Budget was neither reviewed nor approved by any Panasonic personnel. During the relevant period, the amount allocated to the Office of the President Budget exceeded several hundred thousand dollars per year.

20.  Funds expended from the Office of the President Budget were booked on PAC's general ledger in various categories, including travel, payroll, and consultant payments. As a wholly-owned subsidiary of Panasonic, PAC's financials were consolidated into Panasonic's

6

books, records, and accounts. Expenses from the Office of the President Budget would roll up into the "other general administrative expenses" line item on the books of a Panasonic reporting segment and then ultimately into the "selling and general administrative expenses" line item on Panasonic's books, records, and accounts.

21. Despite providing for a discretionary fund, PAC failed to maintain internal accounting controls reasonably designed to ensure that funds expended from the Office of the President Budget were used for their intended purposes, were used in accordance with the law, and were properly recorded in PAC's, and ultimately Panasonic's, books and records. In fact, PAC Executive 1 had complete discretion over how to spend the funds allocated in the budget without meaningful oversight by PAC Finance or any other personnel at PAC.

22. Beginning in at least October 2007 and continuing until at least January 2014, PAC Executive 1 used the Office of the President Budget to make payments to multiple individuals, including consultants that performed limited or no work for PAC with little to no supervision by anyone at PAC. Instead of paying these consultants directly from PAC, PAC Executive 1 arranged for these consultants to be formally retained, and paid, through Service Provider. Other than providing basic administrative and payroll services, Service Provider was not involved in managing or otherwise working with the consultants, but instead acted as a pass through for purposes of invoicing PAC for the consultants, with PAC paying Service Provider a percentage of the consultant's payments. PAC would then pay the consultants through Service Provider for consulting work ostensibly provided by the consultants, even when there was little or no evidence of services being performed to justify the payments.

23. In 2010, PAC Executive 3 requested that PAC's Internal Audit Department conduct an audit of PAC's "vendor selection, payment processing and contract execution." At the

conclusion of the audit, PAC's Internal Audit Department issued a report (the "Selected Vendor Audit Report") that identified a number of compliance risks associated with PAC's use of Service Provider to retain and pay consultants, including the lack of supervision over certain consultants and a lack of deliverables provided to PAC from both Service Provider and the consultants themselves.

24. Specifically, the Selected Vendor Audit Report identified as a "critical risk" that PAC continued to pay consultants through Service Provider even though PAC's agreement with Service Provider had expired in May 2009. In addition, the report identified as a "high risk" the fact that payments were made to multiple consultants in the absence of any deliverables provided to PAC. The report also noted that PAC's procurement department was "not involved in hiring these consultants" and that the "visibility of the contract process needs to be enhanced." An initial version of the report, drafted in September 2010, concluded with a recommendation that "**[Service Provider] consultant payments should be carefully reviewed in light of FCPA regulation** [sic] **due to lack of clarity in deliverables**." PAC Executive 3 received this version of the Selected Vendor Audit Report in March 2011 and other senior PAC executives received this report in May 2012.

25. In December of 2010, an abbreviated version of the Selected Vendor Audit Report was circulated among other PAC employees, including PAC Executive 2 and PAC Executive 3. PAC Executive 4 received this version of the report in November 2012. Although this version of the Selected Vendor Audit Report still identified the risks associated with the payments made through Service Provider and the lack of deliverables for certain consultants, it omitted the final concluding recommendation mentioning the FCPA and certain other observations and recommendations, including the recommendation that "[p]rocurement should be consulted prior

to hiring any consultant or vendors." No explanation was provided for omitting these additional comments from the Selected Vendor Audit Report.

26. Despite the repeated distribution of these two versions of the Selected Vendor Audit Report between 2010 and 2012 among several PAC employees, including PAC Executive 2, PAC Executive 3, and PAC Executive 4, PAC failed to conduct any significant follow up to address the issues raised by the report. Although, in response to a request from PAC, Service Provider began to seek activity reports from consultants as to the work they provided on behalf of PAC, such reports and other deliverables were provided only on an intermittent basis and typically provided very little detail as to the nature of the work performed.

### Foreign Official

27. In 2004, PAC signed a ten-year master product supply agreement with Middle East Airline to provide IFEs on airplanes in Middle East Airline's fleet. On November 12, 2007, PAC and Middle East Airline executed an Amendment to the master agreement (known as Amendment 2), which encompassed a number of separate programs that ultimately earned PAC over $353 million in revenue between 2007 and 2015.

28. At the time of Amendment 2's execution, and until February 2008, Foreign Official was employed as a contracting manager at Middle East Airline and was PAC's primary point of contact at Middle East Airline for contract-related issues. In his position at Middle East Airline, Foreign Official had the ability to take official action and exert official influence over certain contractual terms within Amendment 2. Foreign Official primarily negotiated with PAC through PAC Sales Agent 1.

29. Beginning in April 2007, PAC Sales Agent 1 and Foreign Official began discussing a potential consultancy position for Foreign Official with PAC, while Foreign Official was still

employed by Middle East Airline and working on Amendment 2.  In May 2007, PAC Sales Agent 1 began advocating for a position for Foreign Official with PAC executives, and in July 2007, substantive discussions among PAC senior personnel, including PAC Executive 1 and PAC Executive 2, regarding a consultant position for Foreign Official began in earnest.  Contract negotiations between Foreign Official and PAC continued through the fall of 2007, with PAC ultimately making Foreign Official an offer of a consultant position with an annual salary of $200,000 in late October 2007, while Foreign Official was still employed by Middle East Airline.

30. The master agreement between Middle East Airline and PAC prohibited PAC from offering any consideration to employees of Middle East Airline.  As a result, PAC Sales Agent 1 and PAC senior executives discussed the need to be circumspect about the negotiations surrounding the consultancy offer to Foreign Official and the "risk" that PAC was assuming in making a job offer to Foreign Official while he was still employed by Middle East Airline.  For example, on September 21, 2007, PAC Sales Agent 1 authored an email to three senior PAC executives, including PAC Executive 1 and PAC Executive 2, in which he attached a marked-up consultancy agreement for Foreign Official and commented that "[d]ue to his current status with his present employer, [Foreign Official] does not want any one [sic] contacting him."  In response, PAC Executive 2 stated that PAC "should be very sensitive to [Foreign Official]'s current position" and added that "[w]hat we are doing for [Foreign Official] is a large risk for a corporation like Panasonic.  I think we still should for good reasons, but we must get this done above the table with complete transparency."

31. During this same time period, PAC and Middle East Airline were engaged in negotiations regarding the terms of Amendment 2.  In his role as an employee of Middle East Airline, Foreign Official was responsible for interfacing with PAC and working on aspects of

Amendment 2, including drafting the contract language reflecting the terms agreed to by the parties. Specifically, Foreign Official participated in email communications concerning contracts included in Amendment 2 whereby Middle East Airline engaged PAC to supply IFEs for certain leased planes. Because these planes were not newly manufactured, these contracts required PAC to tailor the IFEs in order to "retrofit" the IFEs onto existing aircraft. Foreign Official was also involved in the negotiations over a series of "reconfiguration" contracts included in Amendment 2 whereby Middle East Airline engaged PAC to reconfigure certain IFEs for newly installed business class and first class seats on aircraft already equipped with PAC IFEs. For example, Foreign Official authored an email on July 30, 2007, in which he advocated for Middle East Airline to select a newer and more expensive PAC IFE model.

32. During this time period, Foreign Official also participated in certain negotiations between PAC and Middle East Airline as to whether nonrecurring engineering ("NRE") costs and supplemental type certificates ("STC") costs would be included in Amendment 2. On February 27, 2008, PAC Sales Agent 1 emailed PAC Executive 1 and PAC Executive 2 and stated that he "worked tirelessly with [Foreign Official] to incorporate payment for NRE / STC/ Certification costs for retrofits to be made part of the contract signed by [a foreign official representing Middle East Airline] and [PAC Executive 1]."

33. Foreign Official resigned from Middle East Airline in February 2008 and was formally retained as a consultant for PAC through Service Provider in April 2008. Foreign Official performed minimal work in his six years of service as a consultant for PAC. Significantly, the 2010 Selected Vendor Audit Report noted that PAC's Internal Audit Department was unable to locate deliverables associated with Foreign Official's consultancy. According to the report, after following up with PAC employees, representatives of the Internal Audit Department were told that

deliverables for Foreign Official did not exist because PAC had requested no services of Foreign Official in the twelve months prior to the report, although PAC still paid Foreign Official's invoices.

34.  Foreign Official's fees were paid out of the Office of the President Budget through Service Provider.  These payments were made in the absence of effective internal accounting controls, including PAC's failure to define the "consulting services" to be provided or obtain sufficient documentation to substantiate the nature and appropriate value of the "consulting services" provided by Foreign Official.  Between 2008 and 2014, PAC paid Foreign Official through Service Provider a total of $875,000 in payments, which were mischaracterized as "consultant payments" on PAC's general ledger, when in fact none, or very few, of the payments to Foreign Official was for actual consultant services.  PAC then caused the payments made to Foreign Official through Service Provider ultimately to be incorrectly designated as "selling and general administrative expenses" on Panasonic's books, records, and accounts.

35.  Between April 2007, when negotiations began with Foreign Official concerning an offer of a consultant position at PAC, and March 2013, PAC earned $92,805,432 in profits from Middle East Airline attributable to twelve programs subsumed under Amendment 2 for which Foreign Official had some involvement or influence, including the IFE retrofit and reconfiguration contracts and contracts for which NRE and STC costs were included.

### Domestic Airline Consultant

36.  Domestic Airline Consultant worked as an account manager at PAC from 2000 until April 2007, when he left PAC to serve as a consultant for Domestic Airline, one of PAC's largest customers at the time.  In October 2007, while Domestic Airline Consultant was still working as a consultant to Domestic Airline, PAC Executive 1 arranged for Domestic Airline

Consultant to be hired by Service Provider to serve as a consultant for PAC effective August 2007. At the time, Domestic Airline Consultant had the ability to take action and exert influence over the business relationship between Domestic Airline and PAC. Domestic Airline Consultant's fees were paid out of the Office of the President Budget through Service Provider. Domestic Airline Consultant served in this dual consultancy role until December 2013 when he returned to PAC as an employee of the Company. Domestic Airline Consultant was separated from PAC in February of 2017. During the period of his dual consultancy, Domestic Airline Consultant reported to PAC Executive 1.

37. Although Domestic Airline Consultant's agreement with Domestic Airline permitted him to undertake other consultant positions so long as they were not with other airlines, that agreement prohibited him from disclosing confidential information. Despite this prohibition, while Domestic Airline Consultant worked as a consultant for both PAC and Domestic Airline, he provided non-public, inside, or otherwise sensitive information to PAC Executive 1 and others at PAC, including forwarding internal communications among Domestic Airline's employees about PAC, information about Domestic Airline's negotiations with a PAC competitor, and pricing information of a PAC competitor. Domestic Airline Consultant typically marked communications in which he provided such information with phrases such as "CONFIDENTIAL," "DO NOT FORWARD," or similar statements suggesting the information was confidential or otherwise sensitive.

38. For example, on July 22, 2008, Domestic Airline Consultant emailed several PAC employees, including PAC Executive 1, and provided the price per IFE shipset for two different types of airplanes that one of PAC's competitors had quoted to another airline. Domestic Airline Consultant prefaced his email with the statement "the following information did not come from

me. . . ." One PAC employee replied to Domestic Airline Consultant's email, stating "[y]ou always have info which makes me shake my head."

39.     On September 23, 2011, Domestic Airline Consultant forwarded to three PAC employees an internal Domestic Airline email chain between Domestic Airline Consultant and various Domestic Airline employees discussing a Domestic Airline employee's questions and concerns about a recent business proposal made by PAC. In so doing, Domestic Airline Consultant provided PAC with a window into the questions Domestic Airline had about PAC's proposal during the course of the negotiations between the two parties. Domestic Airline Consultant stated in the email to PAC employees "please do not let [Domestic Airline] know that you have this from me."

40.     Beyond the provision of such inside or otherwise non-public information, Domestic Airline Consultant performed little additional work for PAC. Under the terms of his consultancy agreement with Domestic Airline, Domestic Airline Consultant was responsible for managing the relationship with PAC, including liaising with the engineering and marketing departments of both parties during the execution of IFE and GCS contracts. In addition, Domestic Airline Consultant served on Domestic Airline's team that evaluated bids submitted by PAC and other vendors for contracts to be awarded by Domestic Airline. In particular, during the dual consultancy period, Domestic Airline Consultant served on two bid review teams for IFE contracts that Domestic Airline ultimately awarded to PAC. As such, although Domestic Airline Consultant was not the ultimate decision maker within Domestic Airline on awarding contracts, he had input into Domestic Airline's decision-making process to award business to PAC.

41.     Between October 2007 and December 2013, PAC paid Domestic Airline Consultant a total of $825,000 in consultancy payments through Service Provider, which were

classified as "consultant payments" on PAC's general ledger, despite the fact that these payments were made in the absence of effective internal accounting controls, including PAC's failure to obtain sufficient documentation to substantiate the nature and appropriate value of the "consulting services" provided by Domestic Airline Consultant. The payments made to Domestic Airline Consultant through Service Provider were ultimately designated as "selling and general administrative expenses" on Panasonic's books, records, and accounts.

42. Between April 2008 and March 2013, PAC earned $22,693,571 in profits attributable to business from Domestic Airline on three different programs for which Domestic Airline Consultant had some involvement or influence, including, for example, by serving as a member of Domestic Airline's bid review committee.

### Concealment of the Use of Sales Agents that Did Not Meet PAC's Diligence Requirements

43. Beginning in at least 1999 and continuing to at least 2016, PAC utilized the services of several third-party sales agents in its China and Asia regions (which PAC designated as separate sales regions between 2008 and 2013) to obtain and manage contracts with state-owned airlines. The commissions PAC paid to such sales agents typically ranged from six to ten percent.

44. PAC failed to put in place adequate controls over its use of sales agents in China and Asia and PAC employees disregarded red flags associated with these sales agents. For example, some of the sales agents were recommended by the state-owned airlines themselves, some sales agents were registered outside of the jurisdiction where they purportedly provided services, and other sales agents were paid outside of the territory where they purportedly provided services. In addition, historically, PAC performed only limited, informal due diligence before retaining third-party sales agents.

45.     Beginning in 2007, PAC began strengthening its internal controls over the retention of third parties, ultimately implementing a formal requirement in 2009 that new and existing sales agents, before engaging in new business on behalf of PAC, had to obtain certification from TRACE International, a U.S. non-profit business membership organization that conducts due diligence reviews of international commercial intermediaries.  When certain sales agents in the China and Asia regions did not pass the anti-bribery certification, PAC terminated its formal relationship with these agents.  Certain PAC employees, however, sought secretly to rehire these agents in contravention of Company policy by rehiring them as "sub-agents" of PAC Sales Agent 2, a sales agent that had obtained TRACE certification.  PAC then relied upon the TRACE certification of PAC Sales Agent 2 to continue working with the sub-agents who had failed, or declined to submit to, the certification process.  In such instances, the commission rates paid by PAC to PAC Sales Agent 2 typically increased by 1 to 2 percent.

46.     For example, beginning in 2003, PAC retained PAC Sales Agent 3 as a direct sales agent for a state-owned airline in Asia.  In 2009, an employee in PAC's contracts department emailed several employees in PAC's Asia region, noting that PAC Sales Agent 3 was "un-responsive on completing and submitting the TRACE Questionnaire" and inquired as to the "plan for getting [PAC Sales Agent 3] to comply."  A PAC Asia marketing employee responsible for interacting with PAC Sales Agent 3 replied that PAC Sales Agent 3 did not "seem keen to comply" with the TRACE certification process and requested that a PAC contract with a state-owned airline be transferred from PAC Sales Agent 3 to PAC Sales Agent 2.

47.     Although PAC terminated its relationship with PAC Sales Agent 3 in 2009 due to its refusal to comply with PAC's certification requirement, in a series of email communications beginning in early 2007, the PAC Asia marketing employee facilitated the creation of a sub-agent

relationship between PAC Sales Agent 3 and PAC Sales Agent 2. Between 2008 and 2010, financial records indicate that PAC sent $3,780,198.65 to PAC Sales Agent 2 for the benefit of PAC Sales Agent 3.

48. In 2010, the same PAC Asia marketing employee again endeavored to undermine PAC's efforts to obtain TRACE certification for its sales agents. In 2009, the owners of a consulting company which had previously served as a direct sales agent for PAC in the Asia region incorporated a new company, PAC Sales Agent 4, which the marketing employee sought to use as a sales agent for PAC to obtain and manage business for a state-owned airline in Vietnam. After the marketing employee was advised by PAC's contracts department that the TRACE due diligence report for PAC Sales Agent 4 "raise[d] issues under the FCPA" because one of its owners "could be considered a 'foreign official' under the Foreign Corrupt Practices Act," the marketing employee used his personal email account to contact a representative of the consulting company, suggesting that the two of them would "need to find another avenue" to engage PAC Sales Agent 4 if PAC's legal department did not approve of the relationship as a result of the TRACE report.

49. In May 2011, PAC Executive 2 received a lengthy email from a senior employee in PAC's China region expressing a number of concerns, among them that the employee had "little or no visibility" into the management of PAC's sales agents in the region. Specifically, the director noted that PAC "continues to place many programs with [PAC Sales Agent 2]" and that he was "very surprised to see that many airlines in Asia are represented by this company (it appears as many as 47 programs)." Despite this email, PAC Executive 2 and others took no action to prevent the continued use of PAC Sales Agent 2 to funnel payments to other sales agents.

50. In total, between 2008 and April 22, 2013, financial records indicate that PAC Sales Agent 2 received at least $7,182,972 from PAC for the benefit of thirteen different sub-agents,

including PAC Sales Agent 3. These payments were improperly booked as commission payments to PAC Sales Agent 2, when in fact they were payments to other sales agents who were otherwise ineligible to work with PAC. PAC then caused Panasonic likewise to falsify its books and records in connection with these payments. PAC terminated its relationship with PAC Sales Agent 2 in March of 2015.

### Causing Panasonic to Falsify Its Books, Records, and Accounts

51.     During the relevant time period, PAC caused Panasonic to falsify its books, records, and accounts in connection with the improper retention of consultants through the Office of the President Budget, the payment of such consultants through Service Provider, and the concealment of the continued use of certain sales agents in China and Asia. Specifically, as noted above, the $875,000 in consulting payments made to Foreign Official through Service Provider were falsely classified as "consultant payments" on PAC's general ledger and ultimately as "selling and general administrative expenses" on Panasonic's books, records, and accounts. In addition, the $7,182,972 in payments PAC paid to PAC Sales Agent 2 for the benefit of at least thirteen different sub-agents were improperly booked by PAC as commission payments to PAC Sales Agent 2, when in fact they were payments to other sales agents who were otherwise ineligible to work with PAC. PAC then caused these payments to likewise be falsely recorded in Panasonic's books, records, and accounts.

52.     Furthermore, as a wholly-owned subsidiary of Panasonic, PAC was required to provide representations and certifications to Panasonic about PAC's financials and financial controls. Specifically, PAC was required to provide certifications of PAC's financial statements for Sarbanes-Oxley consolidation purposes (the "subcertifications") at the end of each fiscal year. In relevant part, the subcertifications required PAC Executive 1 to certify that "no deficiencies

have been identified and the internal control[s] over financial reporting have effectively functioned in [the] company." For each of the fiscal years ending on March 31st between 2010 and 2013, PAC Executive 1 signed the subcertifications but failed to report PAC's improper retention of Foreign Official and Domestic Airline Consultant and the payments to those consultants made through Service Provider, despite PAC Executive 1's knowledge of PAC's relationship with, and payments to, Foreign Official and Domestic Airline Consultant in the absence of such internal controls.

53. In each of the fiscal years ending on March 31st between 2010 and 2012, PAC Executive 2 signed the subcertifications on behalf of his department despite (a) PAC Executive 2's knowledge of PAC's consulting relationship with Foreign Official; (b) PAC Executive 2's receipt of the Selected Vendor Audit Report in 2010, which made him aware of PAC's improper retention of consultants through the Office of the President Budget, including Foreign Official, and the payments to those consultants made through Service Provider; and (c) PAC Executive 2's receipt of an email highlighting the excessive number of airlines represented by PAC Sales Agent 2.

54. Finally, for each of the fiscal years ending on March 31st in 2011 and 2012, PAC Executive 3 signed the subcertifications on behalf of PAC's finance department, and, similarly, for the fiscal year ending March 31, 2013, PAC Executive 4 signed the subcertification on behalf of PAC's finance department. Both PAC Executive 3 and PAC Executive 4 signed these subcertifications despite PAC Executive 3's receipt of the Selected Vendor Audit Report in 2010 and 2011 and PAC Executive 4's receipt of the Selected Vendor Audit Report in 2012, which made them both aware of PAC's improper retention of consultants through the Office of the President Budget, including Foreign Official, and the payments to those consultants made through

Service Provider.

## COUNT ONE
### (Violation of the False Books and Records Provisions of the FCPA)

55. Paragraphs 1 through 54 are realleged and incorporated by reference as though fully set forth herein.

56. From in or around 2007, and continuing through in or around 2013, in the District of Columbia and elsewhere, the defendant,

**PANASONIC AVIONICS CORPORATION**

knowingly and willfully caused Panasonic to falsify its books, records, and accounts and caused Panasonic to not, in reasonable detail, accurately and fairly reflect its transactions and dispositions, to wit: the defendant (i) knowingly provided false or incomplete representations and certifications to Panasonic about PAC's financials and financial controls, and (ii) falsified records relating to the retention of consultants through the Office of the President Budget, the payment of such consultants through Service Provider, and the continued use of certain sales agents in China and Asia, in order to conceal these practices; all in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.

SANDRA MOSER
Acting Chief, Fraud Section

By: _____
Dennis R. Kihm
Jeremy R. Sanders
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20005
Tel: (202) 616-2650
Email: dennis.kihm@usdoj.gov
            jeremy.sanders@usdoj.gov